UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KATHERINE TOSTI, on behalf of J.A.H.M.,

                              Plaintiff,

           v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

_____

DECISION & ORDER

15-CV-6107P

## PRELIMINARY STATEMENT

Plaintiff Katherine Tosti ("Tosti") brings this action on behalf of her minor son J.A.H.M. ("J.M.") pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income Benefits ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 11).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 9, 10). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.    Procedural Background

On July 20, 2012, Tosti protectively filed an application for SSI benefits on behalf of J.M. alleging disability due to his attention deficit hyperactivity disorder ("ADHD"), autism, and pervasive development disorder ("PDD"), not otherwise specified.  (Tr. 116, 120).[1]  On September 17, 2012, the Social Security Administration denied the application for benefits, finding that J.M. was not disabled.  (Tr. 60).  Tosti requested and was granted a hearing before Administrative Law Judge William M. Manico (the "ALJ").  (Tr. 67-69, 78-82).  The ALJ conducted a hearing on July 23, 2013.  (Tr. 31-52).  In a decision dated August 15, 2013, the ALJ found that J.M. was not disabled and was not entitled to benefits.  (Tr. 13-30).

On January 2, 2015, the Appeals Council denied Tosti's request for review of the ALJ's decision.  (Tr. 1-4).  In the denial, the Appeals Council considered additional evidence submitted by Tosti that predated the ALJ's determination but was not submitted until after the ALJ had rendered his decision.  (Tr. 1-2, 4, 176-81, 182-86, 187-204, 205-30, 231-90).  The additional evidence contained a March 10, 2009 psychological report completed by Daniel C. McLaughlin ("McLaughlin"), MS, CAS, a school psychologist.  (Tr. 177-81).  It also included a November 24, 2010 treatment plan from Strong Behavioral Health in which J.M. was diagnosed with ADHD, combined type, PDD, not otherwise specified, rule out psychosis, and was assessed with a Global Assessment of Functioning ("GAF") of 40-50.  (Tr. 183-86).  Also submitted to the Appeals Council were treatment records from Cayuga Center, where J.M. received mental health treatment between November 9, 2012 and March 8, 2013.  (Tr. 205-30).  The additional evidence also included J.M.'s educational records from kindergarten through sixth grade, including his most recent 504 Accommodation Plan.  (Tr. 231-90).  Finally, the evidence

---

[1]  The administrative transcript shall be referred to as "Tr. __."

submitted to the Appeals Council also included treatment notes from Greece Medical Associates, copies of which were in the record at the time of the ALJ's decision.  (*Compare* Tr. 147-69 *with* Tr. 187-204).

Tosti commenced this action on March 2, 2015, seeking review of the Commissioner's final decision.  (Docket # 1).

## II.   Evidence Considered by the ALJ

### A.   Application for Benefits

J.M. was born in 2001.  (Tr. 106).  At the time of the application for benefits in 2012, when J.M. was approximately eleven years old, Tosti reported that J.M. had no difficulty seeing or hearing and that he was not totally unable to talk.  (Tr. 107-08).  According to Tosti, J.M.'s ability to communicate was limited, however; as examples, she noted that he was unable to repeat stories or use sentences with the words "because," "what if," or "should have been." (*Id.*).  Tosti reported that J.M. had difficulty remembering to deliver messages and repeatedly had to be told to do things.  (*Id.*).  She also noted that he had difficulty making friends and was frequently teased.  (*Id.*).  Tosti reported that J.M. could not read capital or lowercase letters, simple words, or sentences, print some letters, write in longhand, add or subtract numbers over ten, tell time, or make correct change when using money.  (Tr. 110).  Additionally, Tosti reported that J.M. had difficulty walking, running, throwing a ball, riding a bike, using roller skates, using scissors, working video game controls, and dressing or undressing dolls or action figures. (Tr. 111).  According to Tosti, J.M. did not have many friends due to his behavioral problems, but was able to get along with teachers.  (Tr. 112).  He also had difficulty using a zipper, buttoning his clothes, tying his shoelaces, choosing his own clothes, using utensils, picking up

his toys, obeying rules, and getting to school on time.  (Tr. 113).  Tosti reported that J.M. had

difficulty focusing on one thing at a time and did not work well with others.  (Tr. 114).

### B.   Greece Medical Associates Records

The ALJ reviewed medical records from Greece Medical Associates, where J.M.

received primary care from Katharine Deiss ("Deiss"), MD, between April 2011 and June 2012.

(Tr. 147-70).  On April 5, 2011, when J.M. was in fourth grade, he attended an appointment with

Deiss to refill his medications.  (Tr. 169-70).  Treatment notes indicate that he was diagnosed

with attention deficit disorder ("ADD") and suffered from learning problems, but was reportedly

doing "okay" in school.  (*Id.*).  He received special education services for reading and was a

"terrific artist."  (*Id.*).  He did not require discipline, but had difficultly remembering and

completing his assignments.  (*Id.*).  Deiss prescribed Adderall and Clonidine.  (*Id.*).

On August 22, 2011, J.M. attended another appointment with Deiss.  (Tr. 152-53).

During the visit, J.M. reported that he had become sick after being cold during the evenings.

(*Id.*).  J.M. reported that he did not have any clean blankets.  (*Id.*).  J.M. was in fifth grade and

continued to receive special education services for reading.  (*Id.*).  Tosti reported that J.M. did

not complete his homework, made frequent mistakes, and lost assignments.  (*Id.*).  Tosti also

reported that J.M. frequently argued with her.  (*Id.*).  Deiss noted that Tosti was argumentative

with her.  (*Id.*).  Tosti complained that J.M. should be taking care of her and her other children

and that J.M. was too old for her to take care of him.  (*Id.*).

Deiss opined that J.M. was low functioning and that his mother was emotionally

inappropriate.  (*Id.*).  She also noted that J.M. had been discharged from mental health treatment

because his mother had failed to take him to his appointments.  (*Id.*).  She noted that Tosti

reported that J.M. bathed everyday, but that his fingernails had packed dirt underneath them, his

ears were full of dirt, and his clothing was "deeply dirty." (*Id.*). Deiss refilled his prescriptions, but noted her concern that Tosti was using the Clonidine to sedate J.M. to keep him "out of her hair." (*Id.*). Deiss believed that J.M. was being emotionally abused, but noted that despite repeated calls to Child Protective Services ("CPS"), J.M. had not been removed from the home. (*Id.*). She noted she would recontact CPS once J.M. returned to school and was in contact with other adults. (*Id.*).

J.M. returned on November 29, 2011 accompanied by his grandfather. (Tr. 167-68). Treatment notes indicate that J.M. had experienced learning difficulties since he started school and did not know his grades. (*Id.*). Deiss expressed concern that J.M. had not required refills for his medication and noted Tosti's report that J.M. had neglected to inform her that he was out of medication. (*Id.*). His grandfather informed Deiss that he believed it was appropriate to expect J.M., who was ten years old at the time, to be responsible for preparing meals for his entire family, including his mother. (*Id.*). Deiss indicated that she would send his medication to his school to ensure that he was taking it and that she would notify his CPS caseworker. (*Id.*). She also noted that she was not certain that Clonidine was an appropriate medication for J.M. (*Id.*).

Further treatment notes from that same day suggest that Deiss was concerned that J.M. was not taking his medication or did not actually need the medication. (Tr. 163). She noted that she had had frequent conversations with his CPS caseworker and believed that parenting issues contributed to the problem. (*Id.*). She noted that she would need to work closely with J.M.'s teachers to determine whether the medication assisted his learning. (*Id.*). According to Deiss, Tosti permitted J.M. to manage his medication, which contributed to the problem. (*Id.*).

She was also concerned that Tosti and her father believed that J.M., as the oldest child, should be responsible for providing care for the entire family.  (*Id.*).

On January 14, 2012, J.M. returned for an appointment with Deiss to refill his medication.  (Tr. 149-50).  His grandfather, who reported that J.M. was excessively active, accompanied J.M.  (*Id.*).  Deiss also noted that she had received letters from Tosti and J.M.'s teacher.  (*Id.*).  Both letters expressed concern that J.M. was unfocused and not completing assignments.  (*Id.*).  Deiss noted that she had had to change J.M.'s prescription to Dexedrine due to a modification in his insurance.  (*Id.*).  She increased the dose to assist with his reported problems.  (*Id.*).  She noted that J.M. displayed a sad affect and that she would contact his teacher to inquire whether it was always present.  (*Id.*).

The treatment notes also contained a letter dated January 13, 2012, which apparently was written by Tosti.  (Tr. 162).  She indicated that J.M.'s teacher reported no improvement in his learning as a result of the medication and that J.M. continued to act out, miss assignments, and be off-task.  (*Id.*).  A note from J.M.'s teacher dated January 11, 2012 reported that she had recently noticed a change in his behavior.  (*Id.*).  According to the teacher, J.M. did not complete assignments, distracted other students, and talked to himself.  (*Id.*).

On June 20, 2012, J.M. attended another appointment with Deiss.  (Tr. 148-49).  He reported that he was receiving As and Cs in school and that he was sleeping all right.  (*Id.*).  Tosti reported that she believed J.M. had done better on the Adderall than he was doing on the Dexedrine.  (*Id.*).  Deiss noted that J.M. was more cheerful during this appointment.  (*Id.*).  Again, she noted that the prescription change to Dexedrine was due to a change in J.M.'s insurance coverage.  (*Id.*).  She increased the dose to address his ongoing issues.  (*Id.*).

C.     **Hilton School District Records**

The record contains a request from the Commissioner to the Hilton Central School District requesting certain educational records, including IEP and associated testing, physical, psychological and psychiatric evaluations, and counseling notes.  (Tr. 131).  In response, on August 14, 2012, the school district indicated that J.M. was not classified but received a 504 Accommodation Plan.  (Tr. 130).  The district also indicated that J.M. had not received any psychological or psychiatric testing, and the district was unable to supply teacher evaluations because the teachers had not returned to work from summer vacation.  (*Id.*).  The school district noted that it would obtain and forward teacher evaluations once school started and the teachers had sufficient time to observe J.M.  (*Id.*).  The school district did provide a copy of J.M.'s 504 Accommodation Plan for the 2012-2013 school year, J.M.'s sixth grade year.  (Tr. 132-34).

The plan indicated that J.M. was a student with a disability that substantially limited his ability to learn.  (*Id.*).  The plan indicated that J.M. suffered from ADHD and PDD, not otherwise specified.  (*Id.*).  According to the plan, J.M.'s impairments were characterized by scattered thoughts, and he could be distracting in the classroom.  (*Id.*).  He had made gains during the previous school year and was motivated to do well.  (*Id.*).  The plan indicated that J.M. had undergone a psychological and educational evaluation in 2004 and speech/language evaluations in 2005 and 2006.  (*Id.*).

The plan required J.M. to be provided preferential seating, prompts for redirection throughout the day, use of a graphic organizer, small group instruction for english language arts, assistance in identifying key ideas in written passages and directions, and assistance prioritizing.  (*Id.*).  He was also to be provided testing accommodations, including separate location, extended

time, verbal directions for each page of questions, and monitoring of his understanding of directions.  (*Id.*).

        **D.**     **<u>A. Hochberg, Psychiatry</u>**

        On September 14, 2012, agency medical consultant Dr. A. Hochberg ("Hochberg") completed a Childhood Disability Evaluation.  (Tr. 55-59).  Hochberg concluded that J.M. suffered from ADHD, but opined that his impairments did not meet or equal a listed impairment.  (*Id.*).  Hochberg opined that J.M. suffered from less than marked limitations in his ability to acquire and use information, to attend and complete tasks, and to care for himself. (*Id.*).  In addition, Hochberg opined that J.M. did not suffer from any limitations in his health and physical well-being or in his ability to interact and relate with others and to move about and manipulate objects.  (*Id.*).  In making this assessment, Hochberg reviewed J.M.'s 504 Accommodation Plan and Deiss's treatment records.  (*Id.*).


**III.**     **<u>Evidence Submitted to the Appeals Council</u>**

        **A.**     **<u>Strong Behavioral Health</u>**

        On November 10, 2010, Peter Martin ("Martin"), MD, and Laura Cardella ("Cardella"), MD, participated in the development of a treatment plan for J.M.'s mental health treatment at Strong Behavioral Health.  (Tr. 183-86).  Cardella and Martin diagnosed J.M. with ADHD, combined type, PDD, not otherwise specified, and rule out psychosis, not otherwise specified, and assessed a GAF of 45-50.  (*Id.*).  According to Cardella and Martin, J.M.'s impairments were characterized by disorganized thoughts, impulsive and aggressive behaviors, and difficulty dealing with normal social cues.  (*Id.*).  According to the treatment notes, J.M. had a history of self-injury, including banging his head.  (*Id.*).  He also demonstrated possible

psychotic symptoms, including auditory hallucinations.  (*Id.*).  Cardella and Martin recommended that J.M. participate in individual psychotherapy and psychopharmacology evaluations with Martin, and they prescribed Adderall for ADHD and Clonidine for ADHD and aggression.  (*Id.*).

### B.    Psychological Evaluation

On March 10, 2009, McLaughlin administered cognitive testing to J.M. (Tr. 177-81).  At that time, J.M. was eight years old and attended second grade.  (*Id.*).  J.M. was referred for testing due to difficulty focusing his attention and completing his work whether working individually or in a group.  (*Id.*).  The testing demonstrated that J.M.'s overall intellectual abilities were within the average range.  (*Id.*).  He demonstrated high average fluency with academic tasks, and average range academic skills and ability to apply those skills.  (*Id.*).  He had a superior ability in written expression and average abilities in reading, mathematics, math calculation skills, and written language.  (*Id.*).  McLaughlin recommended that J.M. continue his current classroom program and placement.  (*Id.*).

### C.    Cayuga Center

On November 9, 2012, J.M. and Tosti met with Cara Morgan ("Morgan"), LMSW, at Cayuga Center for an intake assessment.  (Tr. 206-07).  At the time, J.M. was in sixth grade and attended regular education classes, although he received accommodations.  (*Id.*).  J.M.'s mother had referred J.M. for treatment due to his behavioral issues.  (*Id.*).  According to Tosti, J.M. acted out, talked back, had anger, a short attention span, hyperactivity, poor memory, and impulsivity; according to Morgan, these symptoms supported a diagnosis of ADHD and mood disorder, not otherwise specified.  (*Id.*).  Morgan noted that J.M.'s symptoms were causing conflict and aggression at home.  (*Id.*).  Tosti reported that J.M. used to hear voices from

television shows, and J.M. reported that he used to hit himself in the head in an attempt to make the voices stop.  (*Id.*).  Morgan noted that an additional diagnosis of PDD should be considered or ruled out because J.M. had previously been diagnosed with PDD by Strong Behavioral Health. (*Id.*).  Morgan noted that J.M. had been discharged from previous treatment due to poor attendance.  (*Id.*).

Morgan noted that J.M. was taking Dextromaphine and Clonidine and had previously been prescribed Adderall.  (*Id.*).  She observed that he had fluent speech, but was hyperactive.  (*Id.*).  She diagnosed ADHD, mood disorder, not otherwise specified, and rule out PDD, not otherwise specified, and assessed a GAF of 60.  (*Id.*).  She referred J.M. for a comprehensive evaluation.  (*Id.*).

On January 14, 2013, a comprehensive assessment of J.M. was completed by a clinician, reviewed by Jewell Hopkins ("Hopkins"), LCSW, a supervisor, and ultimately approved by a psychiatrist.  (Tr. 208-18).  The assessment noted that J.M. had previously received therapy and medication at Strong Behavioral Health, which was helpful, but that he was discharged from the program due to poor attendance.  (*Id.*).  He currently was receiving weekly counseling sessions at school.  (*Id.*).  The treatment notes also indicated that J.M. was not compliant with his current prescriptions for Adderall and Clonidine.  (*Id.*).

According to the notes, Tosti's ex-boyfriend had sexually abused J.M.'s sister and had been physically and verbally abusive to Tosti and her children, including J.M.  (*Id.*). Approximately one year prior to the evaluation, the ex-boyfriend had been convicted of the sexual abuse and had been incarcerated.  (*Id.*).  Tosti reported that two of J.M.'s siblings had engaged in inappropriate sexual activities with each other and that J.M. had witnessed those activities.  (*Id.*).  CPS was involved with the family due to the history of sexual abuse.  (*Id.*).  The

treatment notes suggest that J.M. had poor social skills due to PDD and had suffered from speech delays.  (*Id.*).  He had poor attendance at school and had difficulty working independently.  (*Id.*).

Upon examination, J.M. appeared to have poor hygiene and poor eye contact. (*Id.*).  He was cooperative, but impulsive and agitated, with pressured speech and goal-directed thoughts.  (*Id.*).  He suffered from auditory perceptual disturbances and demonstrated some difficulty adjusting and impaired judgment, although he had full orientation and his attention and memory were intact.  (*Id.*).

The assessment indicated that J.M. presented with symptoms of impulsivity, developmental delay, mood lability, defiance, and had a history of witnessing trauma, including domestic violence and sexual abuse of his siblings.  (*Id.*).  He suffered from recurrent dreams relating to his mother's ex-boyfriend.  (*Id.*).  He expressed worry that his friends were not loyal and about being bullied.  (*Id.*).  He also reported hearing voices that had gone away, but had recently returned.  (*Id.*).  J.M. expressed that he did not feel as though his mother cared about him, and he felt ignored.  (*Id.*).  It was assessed that J.M.'s developmental delay, impulsivity, and mood lability interfered with his judgment and insight.  (*Id.*).  Again, he was diagnosed with ADHD, mood disorder, not otherwise specified, and rule out PDD, not otherwise specified, and assessed with a GAF of 60.  (*Id.*).  He was referred for weekly therapy and for psychiatric care. (*Id.*).

On March 8, 2013, J.M. met with Lisa Pappa ("Pappa"), PMHNP, for a psychiatric intake appointment.  (Tr. 219-30).  Upon examination, J.M. demonstrated poor hygiene, poor eye contact, a cooperative attitude, impulsive behavior, agitated motor activity, pressured speech, disorganized and tangential thought processes, goal-directed thought content,

auditory perceptual disturbances, anxious mood, labile affect, some difficulty adjusting

emotionally, intact attention, orientation and memory, and impaired judgment.  (*Id.*).

During the appointment, Tosti reported that J.M. had run out of Adderall and she

had not refilled the prescription.  (*Id.*).  Thus, he had not taken his medication the previous

month.  (*Id.*).  J.M. presented as guarded and avoided eye contact.  (*Id.*).  According to Pappa, he

seemed tense and did not want to engage in a dialogue.  (*Id.*).  J.M. indicated that he felt

depressed and stressed due to issues in his house.  (*Id.*).  Pappa believed that J.M. was

withholding information over concern about his mother's reaction.  (*Id.*).  He reluctantly

endorsed some current auditory hallucinations, but later "back tracked" on that symptom.  (*Id.*).

His thought content appeared fearful and angry, and he rated his mood at a level of six out of ten.

(*Id.*).

Pappa believed that J.M. was depressed and struggled with his emotions and

family turmoil, causing him to frequently isolate himself at home.  (*Id.*).  J.M. stated that he felt

"helpless and alone."  (*Id.*).  Pappa prescribed Strattera to address both his mood and his ADHD

and restarted a lower dose of Adderall.  (*Id.*).  Pappa diagnosed J.M. with ADHD, mood

disorder, not otherwise specified, and rule out PDD, not otherwise specified, and assessed a GAF

of 45-60.  (*Id.*).

     **D.**      **Hilton Central School District**

         **1.**      **Kindergarten (2006-2007)**

Records from the 2006-2007 school year indicate that J.M. received speech

services twice a week.  (Tr. 232-35).  Academically, J.M. demonstrated average skills, but his

overall functional communication was heavily affected by his strong desire to follow his own

agenda, his difficulty remaining on topic and taking turns, his distractibility, and his mild to

moderate dysfluency. (*Id.*). J.M. was unable to understand the roles of listener and speaker, and he frequently attempted to dominate conversations by repeating his demands more loudly and rapidly. (*Id.*). By the end of the school year, J.M. had demonstrated good progress, and his speech dysfluencies were noticeable only when he was excited. (*Id.*). No further speech or language therapy was recommended. (*Id.*).

### 2.    **First Grade (2007-2008)**

J.M.'s report card for this academic year suggested that was reading at an above average level and was developing his speaking fluency, although he still mixed capital and lowercase letters. (Tr. 239-42). He also demonstrated a good understanding of math skills. (*Id.*).

### 3.    **Second Grade (2008-2009)**

School records from the 2008-2009 school year suggest that J.M. was demonstrating difficulties with attention and focus. (Tr. 236-38). He demonstrated difficulty with chair sitting, sensitivity to sounds, rug sitting, body-space awareness, and activity levels. (*Id.*). According to his teacher, he had difficulty attending large and small group instruction and individual instruction. (*Id.*). He constantly moved around and was frequently out of his seat. (*Id.*). Classroom observation of J.M. demonstrated that he needed redirection to topic. (*Id.*). It was recommended that J.M. be permitted to stand in the back of the group, allowed to fidget during circle time, and be provided non-verbal signals to refocus to topic, and breaks to permit movement prior to extended sitting or group instruction. (*Id.*).

J.M.'s progress report suggested that he was making good progress in math, social studies, science, art and reading, although his comprehension required additional attention. (Tr. 243-48). J.M. struggled with writing and was slightly below the benchmark for his grade

level.  (*Id.*).  J.M. also demonstrated difficulties focusing and concentrating and had difficulty

working with other students.  (*Id.*).  According to his teacher, he had difficulty reading other

students' feelings and would sometimes "crowd" them and make them feel uncomfortable.  (*Id.*).

He needed frequent reminders to keep his hands to himself and to give his peers space.  (*Id.*).  He

continued to need frequent reminders to stay focused throughout the day and needed a great deal

of adult assistance to complete his work.  (*Id.*).  Additionally, his difficulties with comprehension

caused him to need directions repeated.  (*Id.*).

J.M. continued to receive speech and language services during the second grade.

(Tr. 249).  His teacher noted that he was making progress, but he continued to have difficulty,

particularly when structure was reduced or he was excited.  (*Id.*).  She recommended that he

continue to receive services the following year.  (*Id.*).  J.M. also received support for reading and

writing.  (Tr. 250).  Although he was reading above grade level, J.M. was inconsistent in his

comprehension and decoding skills.  (*Id.*).  His teacher recommended that he continue to receive

reading and writing support during the following school year.  (*Id.*).

### 4.    Third Grade (2009-2010)

J.M.'s report card for the 2009-2010 school year indicated that he continued to

perform well in math and science and received a C+ in social studies.  (Tr. 254-58).  He did not

meet the benchmark for reading due to continued struggles with fluency, decoding, and

comprehension.  (*Id.*).  He continued to struggle with writing, including capital letters, spelling,

and using complete sentences.  (*Id.*).  Overall, J.M. continued to demonstrate inconsistent effort

and difficulty focusing.  (*Id.*).  He frequently distracted his peers.  (*Id.*).

J.M. continued to receive language arts services to assist with his reading and

writing.  (Tr. 251, 253).  His teacher noted that J.M. had difficulty attending and staying focused.

(*Id.*).  It was recommended that J.M. continue to receive services the following year.  (*Id.*).  J.M.

also received speech and language services.  (Tr. 252).  J.M. demonstrated some progress when

he spoke slowly or when he thought in advance about what he wanted to say.  (*Id.*).  He

continued to display repetitions and dysfluent imitations, particularly when nervous or excited.

(*Id.*).  He also continued to stutter, particularly when talking during inappropriate times.  (*Id.*).

### 5.      Fourth Grade (2010-2011)

J.M.'s report card for the 2010-2011 school year demonstrated that he continued

to perform well in math, social studies, and science.  (Tr. 268-72).  He met the benchmark level

for reading, but continued to struggle with his writing, decoding, and fluency skills.  (*Id.*).  He

continued to exhibit behavioral problems in the classroom, including interrupting others,

sometimes with off-topic thoughts.  (*Id.*).  He also needed reminders to stay on task.  (*Id.*).

J.M. continued to receive reading assistance during the school year.  (Tr. 259,

265-66).  Progress notes indicate that he made slow but steady progress improving his fluency

and comprehension skills.  (*Id.*).  At times, he required teacher assistance to communicate his

thoughts and opinions.  (*Id.*).  It was recommended that he continue to receive reading assistance

the following year.  (*Id.*).  J.M. also received speech and language support services during the

school year.  (Tr. 267).  His teacher reported that he had progressed and recommended that he be

dismissed from further speech services.  (*Id.*).

### 6.      Fifth Grade (2011-2012)

J.M.'s report card for this academic year demonstrated poor performance in math,

social studies, and science.  (Tr. 273-77).  His teacher attributed his declining performance to his

inability to pay attention in class and failure to complete classwork.  (*Id.*).  J.M. failed to meet

the district benchmark level for independent reading for the school year, finishing with a

fourth-grade reading level.  (*Id.*).  His teacher reported that he continued to struggle with

attention and completing assignments.  (*Id.*).  According to his teacher, he frequently

daydreamed, missed instructions, and needed reminders to stay on task.  (*Id.*).  His teacher

indicated that J.M.'s behavior and organization impeded his ability to complete assignments and

make friendships.  (*Id.*).  He had difficulty completing assignments independently and needed "a

lot of support" to complete assignments.  (*Id.*).

   J.M.'s Section 504 Accommodation Plan was reevaluated at the end of his fifth

grade year.  The Plan stated that he continued to suffer from ADHD and PDD, not otherwise

specified, which inhibited his ability to learn and caused scattered thoughts and distractibility.

(Tr. 280-81).  It was recommended that he continue to receive testing accommodations and

supplementary aids, including preferential seating, prompts for redirection, use of a graphic

organizer, small group instruction in english language arts, assistance in identifying key ideas,

and assistance prioritizing.  (*Id.*).

### 7. <u>Sixth Grade (2012-2013)</u>

   J.M. was absent from school more than fifteen times during his sixth grade year,

prompting letters to Tosti regarding his excessive absences.  (Tr. 282-83).  His progress reports

indicated that he performed well in social studies and science, receiving a B- and a B+,

respectively.  (Tr. 285-89).  He continued to struggle in math, and his teacher suggested that he

would benefit from paying closer attention to his work, listening more carefully to the

instructions, and attending help groups.  (*Id.*).  J.M.'s reading abilities progressed during the

year, and he met the district benchmark for reading.  (*Id.*).  He continued to receive support for

reading and writing, and his teacher indicated that she was pleased with his overall progress.

(Tr. 284, 290).  She noted that he continued to struggle with organizing his written thoughts.

(*Id.*).  The teacher noted that he also continued to have difficulty focusing and frequently

distracted himself and others. (*Id.*).

J.M.'s Section 504 Accommodation Plan was reevaluated at the end of his sixth

grade year, and the reevaluated plan indicated that he continued to suffer from ADHD and PDD,

not otherwise specified, which inhibited his ability to learn and which caused him to have

scattered thoughts and to be distracted when learning.  (Tr. 278-79).  The plan recommended that

he continue to receive testing accommodations and supplementary aids for the next school year.

(*Id.*).


## DISCUSSION

### I.      Standard of Review

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether J.M. is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A child is disabled for the purposes of SSI if the child has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  In assessing whether a claimant is disabled, the ALJ must employ a three-step sequential analysis.  *See Miller v. Comm'r of Soc. Sec.*, 409 F. App'x 384, 386 (2d Cir. 2010).  The three steps are:

    (1)   whether the child is engaged in substantial gainful activity;

    (2)   whether the child has a medically determinable impairment that is severe such that it causes more than minimal functional limitations; and

> (3)  whether the child's impairments medically equal or
>       functionally equal a presumptively disabling condition listed
>       in Appendix 1 of Subpart P of Part 404 of the relevant
>       regulations.

*See id.* (citing 20 C.F.R. § 416.924(b)-(d)).

In determining whether a child's impairment functionally equals a listed impairment, the ALJ must evaluate the child's functioning across the following six domains of functioning:

> (1)  acquiring and using information;
>
> (2)  attending and completing tasks;
>
> (3)  interacting and relating with others;
>
> (4)  moving about and manipulating objects;
>
> (5)  caring for oneself; and
>
> (6)  health and physical well-being.

*See id.* (citing 20 C.F.R. § 416.926a(a)).  To be functionally equivalent, the impairment must result in a finding of "extreme" functional limitations in at least one domain or a finding of "marked" functional limitations in at least two domains.  *See id.*

A "marked" limitation is one that is "more than moderate but less than extreme" and that "interferes seriously with [a child's] ability to independently initiate, sustain or complete activities."  20 C.F.R. § 416.926a(e)(2)(i); *see also Spruill ex rel. J.T. v. Astrue*, 2013 WL 885739, *5 (W.D.N.Y. 2013) ("[a] marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the child's] ability to function independently, appropriately, effectively, and on a sustained basis") (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)).  Generally, a "marked" limitation is the equivalent of functioning resulting in scores on

standardized tests that are "at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation is one which "interferes very seriously with [a child's] ability to independently initiate, sustain or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).

In his decision, the ALJ followed the required three-step analysis for evaluating childhood disability claims.  (Tr. 16-28).  Under step one of the process, the ALJ found that J.M. had not engaged in substantial gainful activity since July 20, 2012, the application date.  (Tr. 19). At step two, the ALJ concluded that J.M. has the severe impairment of ADHD.  (*Id.*).  He determined that J.M.'s PDD was not severe because the record did not contain a diagnosis for the disorder from an acceptable medical source.  (*Id.*).  The ALJ observed that the 504 Accommodation Plan included a reference to PDD, but noted that J.M. had not undergone any psychological testing at school.  (*Id.*).  Accordingly, he concluded that J.M's PDD was not a medically determinable impairment.  (*Id.*).  At step three, the ALJ determined that J.M. does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments.  (Tr. 19-20).  In addition, the ALJ concluded that J.M. did not have an impairment (or combination of impairments) that functionally equaled one of the listed impairments.  (Tr. 20-28).  In reaching this conclusion, the ALJ evaluated J.M.'s impairments across the six domains of functioning.  (*Id.*).  Specifically, the ALJ concluded that J.M. suffered from less than marked limitations in the domains of acquiring and using information, attending and completing tasks, and caring for himself.  (Tr. 22-28).  In addition, the ALJ concluded that J.M. had no limitations in the domains of interacting and relating with others, moving about and manipulating objects, and health and physical well-being.  (*Id.*).  Accordingly, the ALJ found that J.M. was not disabled.  (*Id.*).

**II.**    <u>**Analysis**</u>

In her motion, Tosti contends that the ALJ erred in determining that J.M. does not suffer from an impairment or combination of impairments that functionally equals a listed impairment. (Docket # 9-1). First, Tosti maintains that the ALJ failed in his duty to develop the record. (*Id.* at 13-16). Next, Tosti maintains that the ALJ's RFC analysis was not based upon substantial evidence because the additional evidence submitted to the Appeals Council was not adequately considered by the Commissioner and remand is warranted because consideration of this evidence could have altered the ALJ's decision. (*Id.* at 16-26).

Tosti's principal argument is that the ALJ failed in his duty to adequately develop the record by not requesting records relating to J.M.'s mental health treatment and a complete set of his educational records. According to Tosti, the ALJ's duty to further develop the record was triggered when Tosti informed the ALJ during the administrative hearing that the record was incomplete because it was missing J.M.'s mental health treatment records and some of his educational records. (Tr. 33-34, 49-51).

Subsequent to the ALJ's decision, Tosti obtained legal counsel, who marshaled additional evidence on J.M.'s behalf, including a more complete set of educational records, which included psychological testing and which demonstrated that J.M. continued to demonstrate difficulties maintaining attention and concentration, interacting with his peers, and maintaining appropriate behavior in the classroom. (Tr. 176-81, 231-90). In addition, Tosti's counsel obtained treatment records from Strong Behavioral Health, where J.M. was first diagnosed with PDD. (Tr. 182). Finally, Tosti's counsel obtained treatment records from Cayuga Center, which demonstrated that J.M. continued to suffer from ADHD, as well as a mood disorder, and that PDD needed to be ruled out. (Tr. 205-30).

As noted above, these records were submitted to the Appeals Council.  The regulations require the Appeals Council to consider "new and material" evidence "if it relates to the period on or before the date of the [ALJ's] hearing decision."  20 C.F.R. §§ 404.970(b) and 416.1470(b); *see Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996).  The Appeals Council, after evaluating the entire record, including the newly-submitted evidence, must "then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of evidence currently of record."  20 C.F.R. §§ 404.970(b) and 416.1470(b); *Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010).  "If the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision," although the "[n]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review."  *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Perez v. Chater*, 77 F.3d at 45).  The reviewing court's task then is to determine "whether substantial evidence supports the ALJ's decision, when the new evidence is included in the administrative record."  *Ryder v. Colvin*, 2015 WL 9077628, *4 (W.D.N.Y. 2015).

As explained below, I conclude that the ALJ failed to develop the record properly in this case.  I further conclude that remand is warranted because the new evidence submitted to the Appeals Council might have influenced the Commissioner to decide Tosti's application differently.  *See id.*

"It is well established in the Second Circuit that an ALJ is under an obligation to develop the administrative record fully, to ensure that there are no inconsistencies in the record that require further inquiry, and to obtain the reports of treating physicians and elicit the appropriate testimony during the proceeding."  *Martello v. Astrue*, 2013 WL 1337311, *3 (W.D.N.Y. 2013).  Given the non-adversarial nature of a Social Security hearing, "[t]he duty of

the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011) (quoting *Butts v. Barnhart*, 388 F.3d at 386). Accordingly, before determining whether the ALJ's conclusions are supported by substantial evidence, courts must first evaluate whether the claimant was provided a full hearing "in accordance with the beneficent purposes of the [Social Security] Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal quotation omitted); *see also Archbald v. Colvin*, 2015 WL 7294555, *3 (E.D.N.Y. 2015) ("[t]he reviewing court must ensure that 'all of the relevant facts [are] sufficiently developed and considered'") (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 509 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010)). "The ALJ's duty to develop the record is enhanced when the disability in question is a psychiatric impairment." *Ramos v. Colvin*, 2015 WL 925965, *9 (W.D.N.Y. 2015) (internal quotations omitted). Similarly, the ALJ has a heightened duty to develop the record when the claimant is proceeding *pro se*. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 83 (2d Cir. 2009).

Twice during the administrative hearing Tosti expressed her concern that the administrative record was incomplete. (Tr. 33-38, 49-51). Tosti first expressed her concern in the context of a discussion concerning whether she should obtain legal counsel. (Tr. 33-38). Specifically, she noted that the record was missing J.M.'s new 504 Plan and records from Cayuga Center. (Tr. 34). The ALJ responded that Tosti did not need a lawyer to "do that" because the ALJ's administrative assistant will "get you the information to try to get the documents together" and assured her that "the [SSA] actually has an obligation to gather the documents for you." (*Id.*). At the conclusion of the hearing, Tosti again voiced her concern about the incompleteness of the record, and the ALJ again responded by referring her to his

assistant who, he told Tosti, would "get that for you." (Tr. 50). Nothing in the record

demonstrates or suggests that the ALJ made any attempt to obtain the missing information;

instead, he rendered his decision based upon a record that he knew to be incomplete.

   In short, in this case, the ALJ was explicitly informed by a *pro se* claimant that

the record was incomplete, the claimant explicitly identified the missing records, and the ALJ

apparently made no attempt to ensure that the missing records were obtained. Moreover, Tosti

informed the ALJ that J.M. had been diagnosed with PDD by Peter Martin, a psychiatrist at

Strong Behavioral Health. (Tr. 41). Instead of attempting to obtain those records, the ALJ

determined that J.M.'s PDD was not a medically determinable impairment because "[t]here is no

. . . diagnosis of a developmental disorder by an acceptable medical source in the record."

(Tr. 19). Finally, the ALJ's review of the two-page 504 Plan – the only evidence of J.M.'s

educational history contained in the transcript – should have alerted the ALJ to the fact that

psychological testing had been administered to J.M. and the results should have been contained

in his school records. (Tr. 132). Although the school district's response indicated that

psychological testing had not been conducted, that representation clearly conflicted with

information in the 504 Plan that a psychological evaluation had been conducted in July 2004.

(Tr. 131-32).

   "Incomplete" is the only apt characterization of the record before the ALJ in this

case: despite allegations of childhood disability based upon ADHD, PDD, and autism, the record

contained none of the child's educational records, other than a two-page 504 Accommodation

Plan, and none of his mental health treatment records. I easily conclude that the ALJ failed in his

duty to develop the record in this case.

Moreover, a substantial likelihood exists that the additional evidence marshaled by Tosti's counsel and submitted to the Appeals Council could have influenced the Commissioner to reach a different conclusion regarding J.M.'s eligibility for benefits.  As discussed above, the additional evidence reflects a diagnosis of PDD by a medically acceptable source.  (Tr. 183).  That diagnosis could have affected the ALJ's conclusion at step two, as well as his consideration of whether any limitations associated with J.M.'s PDD were relevant to his step three analysis of J.M.'s functioning across the six domains.

The additional information is especially illuminating because the record before the ALJ did not contain any teacher evaluations, opinions from examining physicians, or medical assessments from J.M.'s medical providers.  Indeed, the only medical opinion of record was the evaluation provided by Hochberg, a non-examining physician whose opinion was solely based upon his review of a record that did not contain J.M.'s educational records or his mental health treatment records.  (Tr. 55-56).  Although the government correctly notes that a non-examining physician's opinion may constitute substantial evidence, *see Miller v. Colvin*, 2016 WL 4478690, *13 (W.D.N.Y. 2016) ("the law refutes any suggestion that the opinions of non-examining physicians may never constitute substantial evidence"), Hochberg's assessment in this case was based upon review of a markedly incomplete record.  Under such circumstances, I cannot say that the ALJ's determination, which relied heavily upon Hochberg's opinion, was supported by substantial evidence.  *See Welsh v. Colvin*, 2016 WL 836081, *12 (W.D.N.Y. 2016) (ALJ's decision not supported by substantial evidence where it relied upon non-examining physician opinion that was based upon an incomplete record) (collecting cases).

Indeed, if Hochberg had reviewed the evidence submitted to the Appeals Council, he might have altered his conclusions regarding J.M.'s functioning across the six domains.  For

instance, the additional information suggests that J.M. suffered from attention and concentration deficits, auditory hallucinations and a mood disorder, had difficulty interacting with his peers, and struggled to maintain his personal hygiene.  More importantly, had the ALJ been aware of the additional evidence, the ALJ might have altered his reliance upon Hochberg's opinion, which, as noted above, was made without the benefit of the additional information.  *See Ryder v. Colvin*, 2015 WL 9077628 at *5 (remanding where additional evidence submitted to Appeals Council "reasonably would have altered the weight [the ALJ] gave to the consulting opinions, especially [the non-examining physician's opinion], which was entirely based on a review of the incomplete evidence in the administrative record").  Further, the additional information conflicted with much of the information relied upon by the ALJ, particularly information that led him to conclude that the record lacked evidence of J.M.'s functional difficulties in the domains of interacting and relating with others and caring for himself.

Accordingly, I conclude that remand is warranted for reconsideration of the entire administrative record, including the new evidence submitted to the Appeals Council.  On remand, the ALJ should consider whether additional information such as teacher evaluations, medical assessments from J.M.'s treating providers, or a consulting examination relating to J.M.'s functioning would assist his ultimate determination, and, if so, he should attempt to obtain such information.

## <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 10**) is **DENIED**, and Tosti's motion for judgment on the pleadings (**Docket # 9**) is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is

remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**


_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       September 6, 2016